## PLANTERS OIL MILL *v.* CARTER *et al.*

1. As a general rule, a receiver will not be appointed for mortgaged property upon the application of the mortgagees, in the absence of satisfactory proof of the inadequacy of the security and the insolvency of the mortgagor.
2. Where a mortgage provides that the mortgagor shall keep the property insured for a given amount for the benefit of the mortgagee as his interest may appear, and that upon the failure of the mortgagor so to do the mortgagee may have the property insured for a like amount, and that all sums paid by the mortgagee shall become a part of the mortgage debt and be secured by the mortgage lien, a failure to insure by the mortgagor will not ordinarily authorize the appointment of a receiver for the property.
3. Under the facts of the case, the judge erred in appointing a receiver and granting an interlocutory injunction unless the mortgagor should, within a reasonable time, pay or cause to be paid the taxes, and have the property insured for a stated amount.

                 NOVEMBER 17, 1913.

Receivership. Before Judge Jones. Hall superior court. May 3, 1913.

On March 6, 1913, J. & J. S. Carter, Georgia Railway & Power Company, Z. T. Castleberry, J. S. Carter, H. H. Dean, Mrs. A. M. Jaquish, and G. F. Hughes brought an equitable petition against the Planters Oil Mill, the Gainesville Oil Company (domestic corporations), J. C. Cooper, Marshall C. McKenzie, and Harold C. McKenzie. The substance of the material allegations of the petition was as follows: On April 11, 1912, the Planters Oil Mill, hereinafter referred to as the defendant, or mortgagor, duly executed 17 promissory notes, aggregating the sum of $34,339.12, four of which were for $1,000 each, payable to J. & J. S. Carter, and due respectively on July 1, August 1, October 1, and November 1, 1912; four were for $5,000 each, payable to J. & J. S. Carter, one on January 5, and the other three on April 1, 1913; two were for $2,500 each, payable to J. & J. S. Carter on April 1, 1913; one was for $1,615, payable to J. & J. S. Carter on April 1, 1913; one was for $719.12 payable to the Georgia Railway & Power Company on April 1, 1913; one was for $540 and another for $1,750 payable to H. H. Dean on April 1, 1913; one was for $400 payable to Z. T. Castleberry on April 1, 1913; one was for $417 payable to Mrs. A. M. Jaquish on April 1, 1913; and one was for $78 payable to G. F. Hughes on April 1, 1913. At the time these notes were given, the defendant executed and delivered to the payees thereof, to secure the payment of the same, a mortgage upon its entire oil-mill plant, including realty and personalty of every description connected therewith. The mortgage contained the stipulations, that if default should be made in the payment of any one of the notes, then all should become due, at the option of the holders, with a right to then foreclose; and that the mortgagor should at all times keep the mortgaged property insured to the amount of $27,000, the policy, in case of loss by fire, payable to the mortgagees as their several interests may appear, and, upon default of the mortgagor to keep the property so insured, that the mortgagees, or any one or more of them, should have the right to have the property insured for the amount above named, and that all money so paid for insurance should become a part of the mortgage debt and be secured by the mortgage lien. The first two notes for $1,000 each, payable to J. & J. S. Carter, were paid. The other

two notes for $1,000 each, and the one for $5,000 due January 5, 1913, payable to J. & J. S. Carter, have not been paid, and the defendant has been notified by petitioners that they have elected to declare all the notes due, in accordance with their option so to do contained in the mortgage. The $5,000 note just mentioned was transferred to and belongs to the First National Bank of Gainesville, Ga., and so does the note for $540 payable to H. H. Dean. (The bank is not a party to the suit.) It is alleged, that the defendant "is insolvent and unable to pay its indebtedness; that said material and said machinery is depreciating in value; that the same is not worth more than the amount of your petitioner's claims; that if the said defendant is allowed to keep and run the said mill and machinery, that it will greatly depreciate in value, and will result in great loss to your petitioners." On September 19, 1912, the defendant leased its oil-mill plant for the season of 1912 and 1913, terminating on July 1, 1913, to the Gainesville Cotton Oil Company, in pursuance of 'a contract entered into by the latter company, Marshall C. and Harold C. McKenzie, and the defendant; by the terms of which agreement the defendant, after certain named expenses in the operation of the plant were paid, was to receive one half of the net profits. To better secure the payment of the notes held by petitioners, the lease contract was transferred and assigned to them by the defendant and the Gainesville Cotton Oil Company, on February 17, 1913. The transfer stipulated: "all profits arising from said lease contract to be prorated upon their respective claims." In reference to the lease, "your petitioners show that said profits have been made by running and operating said mill, and that they have not been ascertained or paid." The defendant insured the mortgaged property for $30,000 or $35,000, but has failed to pay the premiums, and the insurance companies are threatening to cancel the policies, and will do so unless the premiums be paid. Among other things, the petition prayed that a receiver be appointed for the Planters Oil Mill, and that the Gainesville Cotton Oil Company and the McKenzies be enjoined from paying to the Planters Oil Mill any of the profits derived from the operation of its plant, and that the mortgage be foreclosed. In an amendment to the petition it was alleged, that the defendant had failed to pay its State, county, and municipal taxes for the year 1912; that executions had been issued,

for such taxes, which would be enforced against the property of the defendant unless their collection was restrained; and that a number of common-law judgments had been rendered against the defendant in favor of various creditors, who would put it in bankruptcy unless a receiver was appointed by the State court to take charge of its assets.

In its answer, the defendant denied its liability on the notes to the amount set out in the petition, and averred that there was a failure of consideration to the amount of at least $25,000 represented by the notes. It denied that it was insolvent, and averred that it was in better financial condition than at the time the mortgage was executed. It further denied that the mortgaged property had depreciated in value, and averred that the machinery in its plant had been added to and its value increased since the execution of the mortgage, and that the value of the mortgaged property was much greater than the claims of the plaintiffs. In the language of the answer: "Defendant admits that it has not paid the said insurance premiums, and unless they have already been paid this defendant is ready to cause or procure the same to be paid." The defendant "amends its answer by offering to cause the taxes or tax fi. fas. against defendant, set forth in the amendment to petition of plaintiffs, to be taken up and held so as not to be enforceable until after a final decree in this cause."

Upon the interlocutory hearing for a receivership, J. Carter of the firm of J. & J. S. Carter testified as follows: "All they [Planters Oil Mill] owe is in that mortgage they gave. They didn't owe us [J. & J. S. Carter] anything individually at the time they gave the mortgage. They owed us on several notes we were indorsers on. The State National Bank of Greenville $7,200, another for $5,000, and another for $2,700. The notes and the mortgage were given to secure the notes which we had indorsed for them in Carolina and here in Georgia, and were given to take the place of those notes which we had indorsed. They gave us these notes secured by the mortgage, and we were to take up the other notes we were indorser on. I haven't taken up those notes, and they are still outstanding against the Planters Oil Mill, and those notes together with the notes we are suing on make a double liability against the Planters Oil Mill. I haven't paid any on these notes outstanding. I have been trying to get the money from the

Planters Oil Mill to pay them with. I have paid interest on some of the outstanding notes, how much I don't remember. The Planters Oil Mill paid this interest for a while, and when they stopped we started suit. $14,700 of the $27,000 I am suing on represent debts that were against the Planters Oil Mill before I gave up its management. The consideration of the mortgage I am suing on, as I understand it, was that we should take up these outstanding notes, and that the mortgage and notes sued on were given in lieu of the notes outstanding." He further testified: "These notes which are payable to our order were taken that way for convenience, and they were to be substituted for the other outstanding indebtedness. I gave one of them to Mr. Castleberry and one to the First National Bank. I hold these notes as collateral to the South Carolina notes. I gave my individual note for one of the South Carolina notes, and I hold these notes to protect my indorsement. When these notes are paid that will settle all liability existing against the Planters Oil Mill at the time. . . I did agree to take up these outstanding notes when this mortgage was given. That $5,000 note is not still outstanding. When I turned over the new note to the bank that one was settled. I can't tell you anything about the $5,000 note to the First National Bank. I haven't paid this new note for $5,000. We have paid and renewed several times. I wouldn't pretend that I have or haven't paid any $5,000 note. Since the 1st day of April, 1912, I have not paid any $5,000 note for the Planters Oil Mill to the First National Bank. Personally, I have not paid any debt of the Planters Oil Mill since the date named. Neither has the firm of J. & J. S. Carter that I know of."

It was shown that the mortgagor owed State, county, and municipal taxes, aggregating $366.13, for the year 1912, that executions had been issued for the same, that a common-law judgment for $300 principal had been rendered against the Planters Oil Mill since the execution of the mortgage, and that a suit was pending against the oil mill on a promissory note for $550 principal. As to the value of the mortgaged property the testimony of the witnesses for the mortgagees was as follows: J. Carter testified, "I can't say whether the mill is as valuable now as it was when the mortgage was made. I haven't been through the mill in a year. I don't know of any deterioration in the value of the mill from the

time we took the mortgage to the present time; only I know that it depreciates in value when they are run. I can't specify any particular deterioration, except that I know of a motor that was burned out. . . I can't say what the mill was worth when I took the mortgage. It had cost about $40,000 up to that time. It was a good mill. . . There was some new machinery in there. . . I don't know that it was worth $50,000. I guess it had cost $50,000 in 1912. I didn't value it at $50,000 then. . . I don't think it could be built for $50,000. . . The mill would not bring $50,000 at this season of the year. Yes, sir, it will bring the amount of this indebtedness. . . An oil mill will depreciate fifteen per cent. with a year's run; sometimes as much as twenty-five per cent. It is owing to the kind of management. With a good superintendent it will not depreciate more than from ten to twenty per cent. This mill had been running for three years. . . When I took the mortgage I knew that the mill would depreciate in value, and I took the mortgage in full faith of that information. When Cooper bought the mill [about three years prior to the hearing] it was pretty well run down, as the season was just over. It is true that under Cooper's management the mill has been materially improved, and is well worth all it cost." Castleberry, one of the mortgagees, testified: "It would be hard to tell whether the mill would bring over $25,000. I haven't been through the mill since the year before Mr. Carter sold it [about four years prior to the hearing]. To just guess at it I would say the mill is worth $25,000 or $30,000." Dean, another mortgagee testified: "I think that $30,000 would be a high price for it [the mill]. I went into the mill when it was taken over by Mr. Carter and Mr. Castleberry. It never did pay any dividends, and has lost money, so far as I could see, every year. I have heard about it making some money, but I don't know about it. . . I know this, that a mill that don't belong to the trust is a pretty bad piece of property." The testimony in behalf of the mortgagor was to the effect that the mortgaged property was worth about $40,000, and that it was in better condition at the time of the hearing than at the date of the mortgage, as the repairs made and new machinery put in more than offset the natural wear and tear of the machinery by use.

The judge passed the following order: "That if the defendant

company, Planters Oil Mill, will within ten days from this date pay or have paid off the State and county taxes and the city tax fi. fas., and have issued and paid for insurance on its oil-mill property in the sum of $27,000, payable to the mortgagees as their several interests may appear, in the event of loss by fire, application for permanent receiver is hereby refused, and the temporary receiver discharged. . . Should the requirement as to payment of taxes and procurement of insurance not·be met as herein required, then Hugh Montgomery is hereby made permanent receiver for said property as prayed, on his making bond in the sum of $5,000 for the faithful performance of his duties as permanent receiver," etc. To this judgment the mortgagor excepted.

*W. A. Charters* and *H. H. Perry,* for plaintiff in error.

*H. H. Dean,* contra.

FISH, C. J. (After stating the foregoing facts.) "Receivers are not appointed as matter of right, but to preserve rights." "The power of appointing receivers and ordering injunctions should be prudently and cautiously exercised, and except in clear and urgent cases should not be resorted to." Civil Code, § 5477. The principal ground on which courts of equity are called upon to lend their extraordinary aid by the appointment of receivers over mortgaged property is the inadequacy of the security for the payment of the mortgage indebtedness. This inadequacy consists of two elements, viz., the insufficiency of the mortgaged premises per se as a fund for the payment of the debt, and the insolvency of the mortgagor or other person primarily liable for the indebtedness, whose duty it is to make good any deficiency in the security. Stated in general terms, the well-established rule, deducible from the clear weight of authority, is, that in all cases where the rents of the property are not specifically pledged as security for the debt, to entitle the mortgagee to a receiver for the mortgaged premises, and for the rents and profits, he must show, first, that the property itself is an inadequate security for the debt with interest and costs of suit; and, second, that the mortgagor, or other person who is personally liable for the payment, is insolvent, or beyond the jurisdiction of the court, or of such doubtful responsibility that an action against him for the deficiency would prove unavailing. High on Receivers, § 666. In the application of this

rule, the courts require satisfactory proof, both as to the inadequacy of the security and the insolvency of the mortgagor or other person liable for the debt; and unless both these conditions are shown to exist, no satisfactory cause is presented to warrant the interference of equity. Ib. § 667. See, to the same effect, Beach on Receivers, § 524; Alderson on Receivers, § 417 et seq.; and the many adjudicated cases cited by these authors. In the case at bar it is manifest that the plaintiffs, according to the evidence which we have been at some pains to particularly set forth, did not show a clear and urgent case for a receivership over the mortgaged property in order to preserve their rights. According to the evidence of the plaintiffs themselves, who testified on the hearing, the mortgaged property was amply sufficient for the payment of all the mortgage indebtedness, as well as the taxes due on the property and any premiums for insurance that the mortgagees might advance. Indeed, if the notes payable to J. & J. S. Carter did not, in their hands, represent a valid indebtedness against the mortgagor, because of a failure of consideration (which is seemingly true), then the value of the mortgaged property was something like at least five times as great as the valid mortgage indebtedness. Moreover, under the evidence submitted in behalf of the plaintiffs, it could not be said that the mortgagor was shown to be insolvent. Again, it appeared that the mortgagor had leased the mill plant, and had transferred the lease to the mortgagees, in order that they might be entitled to receive whatever profits might accrue from the operation of the mill by the lessees, as further security for the mortgage indebtedness, and that the term of the lease had not expired. From the nature of the order passed by the trial judge, we assume that he was of the opinion, from the evidence submitted to him, that the plaintiffs were not entitled to a receivership on the ground of the inadequacy of their security and the insolvency of the mortgagor, but, as the mortgagor had suffered taxes to remain unpaid, and had failed to keep up insurance on the mill property, that a receiver should be appointed unless the taxes should be paid and the insurance procured by the mortgagor. Under the facts of the case, we can not concur in this view. There was a stipulation in the mortgage to the effect that the mortgagor should procure insurance on the mill property in a given amount, and should keep it up for the benefit of the mortgagees; and in the event of its

failure to do so, then the mortgagees might have the property insured for a like amount, and the cost of insurance should become a part of the mortgage indebtedness.  In view of this agreement, we are of the opinion that the failure of the mortgagor as to the insurance was not cause for the appointment of a receiver, as the mortgagees had the right, under the contract, to protect their security in this respect; especially when the excess of the value of the property over the indebtedness is considered.  The exact point was before the Supreme Court of Idaho in the case of Eureka Mining etc. Co. *v.* Lewiston Navigation Co., 12 Idaho, 472 (86 Pac. 49), and it was held: "Where a mortgage provides that the mortgagor shall keep the property insured, and that in case he fails to do so the mortgagee may insure, and that all sums paid by the mortgagee for insurance shall become a part of the mortgage debt and be secured by the mortgage lien, a failure to insure by the mortgagor will not amount to such waste of the security as to authorize the appointment of a receiver to take charge of the property."  In *Ray* v. *Carlisle,* 125 *Ga.* 316, it was held: "Even if the claims of the plaintiff were of such character that the property in controversy was either legally or equitably charged with their payment, the fact that the building is uninsured, and in the event of its destruction by fire the land could not be sold for a sum sufficient to pay the amount claimed by the plaintiff, does not constitute such a 'manifest danger of loss or destruction' of the property as would warrant the appointment of a receiver to take charge of the same and impound the rents therefrom."

In view of the evidence, showing the value of the mortgaged property so largely in excess of the valid indebtedness secured by the mortgage, the mere fact that the mortgagor suffered the State, county, and municipal taxes to the amount of $366.13 to accumulate and remain unpaid did not authorize the appointment of a receiver.  It was not made to appear that the security of the mortgagees would manifestly be impaired, even if a portion of the mortgaged property should be sold for taxes.  It was not shown that the property was of such character that the executions could not be levied upon some separable part thereof which could be sold without interrupting the operation of the mill.

*Judgment reversed.  All the Justices concur.*